Slip Op. 07-169

UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————— :
                                                      :
SHANDONG HUARONG MACHINERY CO., :
LTD., SHANDONG MACHINERY IMPORT :
& EXPORT CORPORATION, LIAONING :
MACHINERY IMPORT & EXPORT :
CORPORATION, AND TIANJIN :
MACHINERY IMPORT & EXPORT :
CORPORATION, :
                                                      :
                    Plaintiffs, :
                                                      : Before: Richard K. Eaton, Judge
          v. :
                                                      : Consol. Court No. 04-00460
UNITED STATES, :
                                                      : Public Version
                    Defendant, :
                                                      :
          and :
                                                      :
AMES TRUE TEMPER, :
                                                      :
                    Deft.-Int. :
———————————————————— :

OPINION

[United States Department of Commerce's Remand Results sustained.]

Dated: November 20, 2007

*Hume & Associates, PC* (*Robert T. Hume*), for plaintiffs.

*Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *Jeanne E. Davidson*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Courtney E. Sheehan*); Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Scott Daniel McBride*), of counsel, for defendant.

*Wiley Rein, LLP* (*Timothy C. Brightbill, Michael W. Schisa* and *Daniel B. Pickard*), for defendant-intervenor.

Eaton, Judge: At issue in this consolidated action[1] are the United States Department of Commerce's ("Commerce" or the "Department") final results in the twelfth administrative review of four antidumping duty orders covering heavy forged hand tools ("HFHTs")[2] from the People's Republic of China ("PRC") for the period of review beginning on February 1, 2002, and ending on January 31, 2003 ("POR").  *See* HFHTs, Finished or Unfinished, With or Without Handles, From the PRC, 69 Fed. Reg. 55,581 (Dep't of Commerce Sept. 15, 2004), *as amended*, 69 Fed. Reg. 69,892 (Dep't of Commerce Dec. 1, 2004) (collectively, "Final Results"). In *Shandong Huarong Machinery Co. v. United States*, 30 CIT __, 435 F. Supp. 2d 1261 (2006) ("*Shandong I*"), the court sustained certain aspects of the Final Results and remanded several issues to Commerce.

Now before the court are Commerce's Final Results of Redetermination ("Remand Results").  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000).  For the following reasons,

---

[1]    This action includes court numbers 04-00460, 04-00526, 04-00644 and 04-00652.  *See Shandong Huarong Machinery Co. v. United States*, Consol. Ct. No. 04-00460 (CIT Feb. 28, 2005) (order granting motion to consolidate cases).

[2]    The four antidumping duty orders at issue cover: bars/wedges; picks/mattocks; hammers/sledges; and axes/adzes. *See* HFHTs, Finished or Unfinished, With or Without Handles, From the PRC, 69 Fed. Reg. 55,581, 55,582 (Dep't of Commerce Sept. 15, 2004).

Consol. Court No. 04-00460                              Page 3

Commerce's Remand Results are sustained.


## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(I).


## DISCUSSION

I.   The Court Sustains Commerce's Selection of 139.31% as the Adverse Facts Available Rate for TMC's Sales of Bars/Wedges

In *Shandong I*, the court found that Commerce did not justify with sufficient factual findings its decision to use, as the adverse facts available ("AFA") rate, the highest calculated rate for TMC in a previous administrative review, namely, the eighth review covering the period February 1, 1998, to January 31, 1999. *Shandong I*, 30 CIT at __, 435 F. Supp. 2d at 1274-75 ("[B]y merely selecting a rate from a previous review, Commerce has not provided the court with sufficient factual findings justifying its application of the 139.31% rate.").

In the Remand Results, Commerce maintains that the 139.31% rate is reliable and relevant to Tianjin Machinery Import & Export Corp. ("TMC").  With respect to the reliability of the rate, Commerce states that "[t]he 139.31 percent margin was calculated for the same respondent from verified data submitted

by that respondent in a recently completed review."  Remand
Results at 8.  With respect to the rate's relevance to TMC,
Commerce relies on similar reasoning: "[S]ince the rate was
calculated for TMC, the Department has determined that the 139.31
percent rate reflected recent commercial activity by the same
company in exporting bars/wedges to the United States."  *Id*. at 9
(citations omitted).

        In addition, to support the finding that the 139.31% rate is
reliable and relevant to TMC, Commerce cites the following
additional factual support:

> The Department sought additional information
> to test whether TMC's sales during the eighth
> administrative review are reflective of TMC's
> commercial activity during the underlying
> review period.  The Department obtained
> information from the Automated Commercial
> System (ACS) of the U.S. Customs and Border
> Protection (CBP) regarding the sales values
> of TMC's merchandise classifiable under [the]
> harmonized tariff schedule subheading . . .
> applicable to the merchandise subject to the
> bars/wedges order.  The Department
> specifically queried the two review periods
> at issue: February 1, 1998, through January
> 31, 1999 [the eighth review], and February 1,
> 2002, through January 31, 2003 [the twelfth
> review].  Using this information, the
> Department calculated a weighted-average unit
> value (AUV) for each period, for TMC's sales
> of merchandise subject to the bars/wedges
> order.  The Department compared the AUV from
> each period and found that TMC's AUVs for
> subject merchandise declined by 38.18 percent
> from the earlier to the later period.  This
> change in TMC's AUVs values contrasts with
> little to no change in the production process
> used by the PRC industry to produce
> bars/wedges over the last five years, as

> demonstrated by respondent questionnaire
> responses and verifications from multiple
> administrative review proceedings.  Thus,
> because the production process of the
> industry has generally stayed constant, while
> TMC's U.S. sales values have declined, the
> Department concludes that this information
> further substantiates the relevance of the
> 139.31 percent margin as AFA for TMC's sales
> of merchandise under the bars/wedges order.

*Id.* at 10.  In other words, for Commerce, the 139.31% rate is

reliable and relevant to TMC because, while the production

process for bars/wedges generally remained constant between the

eighth and twelfth reviews, TMC nonetheless experienced a 38.18%

decline in the price per kilogram of its bars/wedges sales to the

United States between the two reviews.[3]  Commerce thus apparently

concludes that, because the U.S. price dropped between the two

periods of review, a calculated twelfth review rate would, if

anything, have been greater than 139.31%.

Commerce also presents, as further factual support for the

139.31% rate, the volatility of TMC's margins and those of other

respondents in past reviews.  In particular, Commerce highlights

the seventh, eighth, ninth and tenth[4] administrative reviews of

---

[3]     In order to make this comparison, Commerce reduced to a
weighted-average unit value TMC's sales activities during the
eighth and twelfth reviews: [[                        ]] for the
eighth review and [[                ]] for the twelfth
review.  *See* Remand Results, Apps. 2 & 3.

[4]     The tenth administrative review was the last in which
the Department reviewed TMC's sales of bars/wedges.  Remand
Results at 10.

TMC's sales of merchandise covered by the bars/wedges order.  In the seventh review, Commerce assigned TMC a rate of 47.88%. Commerce calculated a 139.31% rate for TMC in the eighth review (an increase of 92 percentage points); a 0.56% rate in the ninth review (a 248-fold decrease); and a 0.48% rate in the tenth review (a negligible change from the ninth review).  *See* Remand Results at 10.  Noting the "wide swings" in TMC's margins in three of the last four reviews in which TMC participated, Commerce concludes that "[a]n increase in its rate for the underlying review to 139.31 percent . . . is in accordance with TMC's rate history."  *Id*. at 11.

In addition, Commerce finds that the HFHT industry overall has a "history of volatility." *Id*. at 11.  In the Remand Results, Commerce observes "considerable volatility" in Liaoning Machinery Import & Export Corp., Ltd. and Liaoning Machinery Import & Export Corp.'s (collectively, "LMC") and Shandong Huarong Machinery Co., Ltd.'s ("Huarong") calculated margins between the sixth and eleventh administrative reviews. Specifically, Huarong's rate went from 34% in the sixth review, to 1.27% in the seventh review and to 27.28% in the eighth review.  LMC's rate went from 0.0% in the seventh review, to 27.18% in the eighth review and back to 0.0% again in the tenth review.  Thus, Commerce maintains that (1) "the steep decline in TMC's AUVs"; (2) the history of volatility in the antidumping

rates in the industry generally; and (3) the fact that the

139.31% rate was calculated for TMC in the eighth review all

support the conclusion that its application of the 139.31% rate

as AFA to TMC is supported by the record.  *Id*. at 11.

Plaintiffs' principal objection to the 139.31% rate is that

it is "not relevant to TMC's *recent* commercial activity."[5]  Pls.'

Comments on Commerce's Remand Results ("Pls.' Comments") 10

(emphasis in original).  Plaintiffs argue that to ensure that

TMC's margin is calculated as accurately as possible, the

Department should be required to calculate TMC's actual rate or

---

[5]     The court is not persuaded by plaintiffs' additional
argument that Commerce improperly failed to consider plaintiffs'
claim that the surrogate data used to calculate the 139.31% rate
was tainted by subsidies.  Pls.' Comments 6.  Plaintiffs'
subsidization arguments were not a part of the court's remand
opinion and order, and as such, Commerce was under no obligation
to revisit them.  The court notes, however, that a similar
argument was rejected in *Tianjin Machinery Import & Export Corp.
v. United States*, 31 CIT __, Slip Op. 07-131 (Aug. 28, 2007) (not
reported in the Federal Supplement), where TMC and Huarong,
plaintiffs in that action, contended that Commerce was precluded
from using TMC's calculated rate from the eighth review of the
orders on HFHTs because that rate was calculated using Indian
data that plaintiffs insisted was distorted by subsidies.  The
Court found that the plaintiffs were foreclosed from making that
argument because "(1) plaintiff[s] put no actual evidence of
subsidization on the record, either in this review or during the
eighth review; and (2) the issue of subsidization was not raised
during plaintiffs' challenge to the final results of the eighth
review before this Court."  *Id*. at __, Slip Op. 07-131 at 34 n.10
(citing *Shandong Huarong Gen. Corp. v. United States*, 25 CIT
1226, 177 F. Supp. 2d 1304 (2001)).  Here, the same holding
applies.  Plaintiffs did not place any actual evidence of
subsidization on the record in either the eighth or twelfth
review, nor did they raise the subsidization issue in the eighth
administrative review.

use a calculated rate from an administrative review more recent

than the eighth review and then add a deterrent amount.  Pls.'

Comments 13.  Thus, plaintiffs argue that in this case

> the Department should have looked to
> TMC's . . . previous calculated highest-
> weighted average margins.  In TMC's case, the
> Department should have utilized either the
> 0.56 percent or 0.48 percent weighted-average
> margins calculated for the 1999-2000 and
> 2000-2001 reviews respectively as the
> starting point and then added a deterrent
> amount, for example, [TMC's] forgone profits.

Pls.' Comments 14.

   The court cannot credit plaintiffs' position under the

circumstances of this case.  In the Final Results, Commerce found

that the use of facts otherwise available and AFA was appropriate

because of a failure to reveal the pertinent details of an

"invoicing scheme whereby the 'principal' employed an 'agent,'

which was subject to much lower duties than the principal, as a

tool to evade Commerce's orders."[6]  *Shandong I*, 30 CIT at __, 435

---

[6]   TMC, LMC and Huarong  were found to be involved in an
invoicing scheme.  *See* Final Results, 69 Fed. Reg. at 55,583.  In
particular, Commerce found that

> TMC, whose cash deposit and assessment rates
> were lower than Huarong['s], sold blank
> invoices to Huarong, which then reported the
> entries as TMC's to Customs and
> benefitted from the very low rates applicable
> to TMC.  Likewise, the record shows
> that LMC and TMC sold their invoices to
> companies that reported their entries to
> Customs as made by LMC or TMC, as
> appropriate, and, thus, benefitted from lower
>                                    (continued...)

F. Supp. 2d at 1268.  In *Shandong I*, the court found justified

Commerce's use of facts otherwise available:

> As a result of the inadequate answers found
> in the initial section A responses, Commerce
> was required to issue several supplemental
> questionnaires in order to get the necessary
> information to complete its investigation.
> Consequently, even though the Companies
> ultimately disclosed the circumstances
> surrounding their "agency" relationships,
> their failure to do so until after the
> issuance of several supplemental
> questionnaires surely significantly impeded
> Commerce's investigation by requiring the
> agency to prolong its review.

*Id.* at __, 435 F. Supp. 2d at 1269-70 (citations omitted).  The

court also found justified Commerce's use of AFA: "[T]he

Companies' failure initially to provide the relevant information

with respect to their invoicing arrangement, information that was

fully within their command, justified Commerce's application of

AFA to the Companies' sales of bars and wedges."  *Id.* at __, 435

F. Supp. 2d at 1270.

   Because of TMC's participation in the invoicing scheme, all

of its sales data was necessarily tainted.  Thus, no rate could

be calculated using TMC's actual data.  As a result, "[b]ecause

Commerce had permissibly rejected all of TMC's data as

unreliable, the information remaining upon the record consisted

---

[6](...continued)
        rates.

*Shandong I*, 30 CIT at __, 435 F. Supp. 2d at 1268 (citation
omitted).

of publicly available data, data from past reviews, or data from
other respondents in the current review." Def.'s Resp. to
Parties' Remand Comments ("Def.'s Resp.") 12 (internal citation &
quotation marks omitted). Accordingly, despite plaintiffs'
insistence that Commerce should calculate a rate for TMC's
bars/wedges, Commerce had no reliable information from which to
do so.

As a result, the court finds that Commerce has supported
with substantial evidence its use of the 139.31% rate. Here, all
of TMC's sales data is tainted and unsuitable for calculation of
an actual rate. Commerce's use of the 139.31% rate is relevant
because it was calculated for TMC in a recent review and reliable
because it accords with the volatility observed in TMC's rate and
that in the industry generally in the five years between the
eighth and twelfth reviews. As noted by the Court of Appeals for
the Federal Circuit, "Commerce is in the best position, based on
its expert knowledge of the market and the individual respondent,
to select adverse facts that will create the proper deterrent to
non-cooperation with its investigations and assure a reasonable
margin." *F.Lii De Cecco Defendant-intervenors Filippo Fara S.
Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir.
2000). Therefore, the court finds that Commerce's selection of
139.31% as the AFA rate for TMC's sales of bars/wedges is
supported by substantial evidence and, accordingly, it is

sustained.


II.  The Court Sustains Commerce's "Commercial Quantities"
     Determination

        In the Final Results, Commerce denied SMC's request, made

pursuant to 19 C.F.R. § 351.222(e)(1) (2004),[7] for partial

revocation of the order on hammers/sledges, upon finding that the

regulation's "commercial quantities" requirement had not been

satisfied.  19 C.F.R. § 351.222(e)(1)(ii).  That is, Commerce

examined SMC's hammer and sledge sales during the three-year

period identified in its request for revocation, i.e., 2000 to

2003 (the "revocation review period"), and found that SMC's

exports in the year 2000-2001 were "abnormally small" when

_____

        [7]    This regulation provides that an exporter or producer
may ask Commerce to revoke an order with respect to that exporter
or producer if, with the request, that person submits:

               (i) The person's certification that the
               person sold the subject merchandise at not
               less than normal value during the period of
               review . . . and that in the future the
               person will not sell the merchandise at less
               than normal value;

               (ii) The person's certification that, during
               each of the [three] consecutive years . . .
               the person sold the subject merchandise to
               the United States in commercial quantities;
               and

               (iii) If applicable, the agreement regarding
               reinstatement in the order . . . .

19 C.F.R. § 351.222(e)(1)(i)-(iii).

compared to exports during the original period of investigation,
November 1, 1989, through April 30, 1990 ("POI" or the "benchmark
period").

In reaching its conclusion, Commerce relied on its past
practice of comparing the benchmark period to imports during the
revocation review period to determine whether the commercial
quantities requirement has been met.  The court found
insufficient Commerce's reliance on this past practice without
explanation as to how it fulfills the purpose of the regulation:
"What Commerce does not explain is why its . . . practice
fulfills the purpose of the regulation, which is to ensure that
an exporter will continue to participate in fair trade practices
upon revocation."  *Shandong I*, 31 CIT at __, 435 F. Supp. 2d at
1278 (footnote & citation omitted).  The court then remanded this
issue to Commerce:

> Without further explanation, . . . it is
> difficult to see how the . . . "benchmark"
> methodology employed by Commerce would
> further the purpose of the regulation.  That
> is, why is Commerce's method a reasonable way
> to ensure the regulation's goals.  For that
> reason, the court remands this issue in order
> to allow Commerce to provide the court with
> an explanation as to how its methodology
> results in a reasonable measure of
> "commercial quantities."  That is, Commerce
> must explain: (1) how it arrived at the
> "benchmark period"; (2) why it was reasonable
> in its selection; and (3) how a comparison of
> the two periods demonstrates that the exports
> for the year 2000-2001 do not constitute
> commercial quantities.

*Id.* at __, 435 F. Supp. 2d at 1279.

In the Remand Results, Commerce explains why it believes its practice is appropriate:

> In determining whether a respondent shipped in commercial quantities, absent substantial and unusual changes in the respondent's business operations, the Department uses the sales quantity reported by the respondent during the less-than-fair-value . . . investigation or the POI as the benchmark because this period shows the respondent's normal commercial behavior before the imposition of the antidumping order (<u>i.e.</u>, pre-order shipment levels). In the <u>Final Results</u>, the Department found that SMC's average monthly sales quantity during . . . 2000-2001 . . . was less than three percent of the average monthly sales quantity SMC sold during the POI. The Department has declined to revoke antidumping orders in past cases when an administrative review period has a commercial quantity that is only a few percentage points of the commercial quantity sold during the benchmark period, normally the POI.

> The "commercial quantities" requirement ensures that the Department's revocation determination is based upon a company's normal commercial practice. When making such an assessment, the Department generally will use the original POI as a benchmark for a company's normal commercial behavior. The POI is a logical benchmark for this assessment, because it is the only time period for which the Department has evidence concerning the company's normal commercial behavior with respect to exports to the United States without the discipline of the antidumping duty order. Sales during the [revocation review period, i.e., 2000-2003] which . . . are an abnormally small quantity do not provide a reasonable basis for determining that the discipline of the order is no longer necessary to offset dumping.

> For purposes of revocation, the Department
> must be able to determine that past margins
> are reflective of a company's normal
> commercial activity.

Remand Results at 12-13 (citations omitted).  In other words,

because SMC's sales during 2000-2001 (the first year of the

revocation review period) were "abnormally small"[8] compared to

its sales during the POI (November 1, 1989, through April 30,

1990), Commerce claims it does not have a reasonable basis on

which to decide to revoke the order.  Thus, on remand, Commerce

has again declined to partially revoke the order, upon finding

that the "commercial quantities" requirement has not been

satisfied.

Plaintiff SMC challenges Commerce's methodology, arguing

that it is unreasonable (1) to use the POI as a benchmark; and

relatedly (2) to base commercial quantities on a comparison of

the POI and the three-year revocation review period (2000-2003).

The court sustains as reasonable Commerce's methodology for

determining whether the commercial quantities requirement of 19

C.F.R. § 351.222(e)(1) has been satisfied using the POI as the

benchmark period.  "Commerce's interpretation of its own

regulations must be given effect so long as it sensibly conforms

---

[8]    Commerce found "the 2000-2001, 2001-2002, and 2002-2003
review periods represent [[    ]], [[    ]], and [[    ]]%
of SMC's U.S. sales quantity during the POI, respectively."  Mem.
from Jeff Pedersen, Commercial Quantity Analysis of Shipments of
HFHTs (Hammers/Sledges) to the United States by SMC (Mar. 1,
2004) at 3-4.

to the purpose and wording of the regulations . . . ." *Dofasco Inc. v. United States*, 28 CIT 263, 275, 326 F. Supp. 2d 1340, 1350 (2004), *aff'd*, 390 F.3d 1370 (Fed. Cir. 2004) (citation & quotation marks omitted). Here, Commerce's interpretation of the revocation regulation is reasonable and sensibly conforms to the purpose of the regulation—ensuring dumping will not ensue upon revocation of the order.

Under the regulations, before an antidumping duty order may be partially revoked, the producer or exporter requesting revocation must have sold the subject merchandise in commercial quantities at not less than normal value for three consecutive years. *See* 19 C.F.R. §§ 351.222(e)(1), (b)(2); *Elkem Metals Co. v. United States*, 31 CIT __, __, Slip Op. 07-63 at 4 (May 3, 2007) (not reported in the Federal Supplement) ("[Subsection] 351.222(e)(1) requires a certification that the company sold the subject merchandise in commercial quantities in each of the three years forming the basis of the revocation request . . . ."). This is so that Commerce will have a sufficient factual basis upon which to determine whether dumping would ensue upon revocation of the order. Remand Results at 13 ("For purposes of revocation, the Department must be able to determine that past margins are reflective of a company's normal commercial activity.").

To determine whether the "commercial quantities" requirement

has been satisfied, Commerce has devised a methodology by which
it generally compares the quantity of U.S. sales in each of the
three years in the revocation review period to the quantity of
U.S. sales made by the producer or exporter during the original
POI, i.e., the period before the imposition of the antidumping
duty order.  Commerce's stated reason for using the POI as a
benchmark period is that it needs, as a starting point, a period
where the quantities exported to the United States were
unfettered by the antidumping duty order.  According to Commerce,
"absent substantial and unusual changes in the respondent's
business operations," sales activity during the POI would
indicate the normal commercial practices of the producer or
exporter.  *Id*. at 12.

     There is nothing unreasonable in Commerce's approach.
First, it was reasonable for Commerce to use the POI as a
benchmark because it is the only period with respect to which
Commerce would have evidence of a respondent's pre-order shipment
levels.  These levels can fairly be assumed to reflect the level
of activity that would result were the orders not in place.
Moreover, Commerce's methodology reasonably allows for deviation
from this practice where there is evidence of a "substantial and
unusual change" in a respondent's business operations after the
imposition of the order, which would render the POI an unreliable
indicator of what the company's normal commercial activity is.

No party has cited to any meaningful record evidence that this is
the case here.

Second, while it may be that some other method for
determining commercial quantities could be constructed, the court
finds that determining commercial quantities based on a
comparison of the amount of sales during the POI and the amount
of sales during the three-year revocation review period is not
unreasonable.  Rather, the comparison allows Commerce to estimate
what the likely commercial behavior of a respondent would be in
the absence of the order, thus furthering the purpose of the
regulation.  Although here the benchmark period is somewhat
remote from the revocation review period, because the existence
of the order can be assumed to have altered commercial behavior,
it is not unreasonable to reference the period before the order
was in place when making comparisons.  The court finds Commerce
has sufficiently explained why its benchmark practice fulfills
the purpose of the regulation.  *See Shandong I*, 31 CIT at __, 435
F. Supp. 2d at 1278.

The court further sustains Commerce's finding that SMC did
not satisfy the commercial quantities requirement for three
consecutive years.  The record evidence indicates that in 2000-
2001, SMC's average monthly sales quantity was less than three
percent of the average monthly sales quantity SMC sold during the
POI.  Remand Results at 12.  This finding is uncontested.

Commerce's conclusion that so small a percentage did not give it
a basis for finding that SMC shipped in commercial quantities
cannot be found to violate the regulations.  *See* 19 C.F.R.
§ 351.222(e)(1).  As the record supports Commerce's finding that
SMC did not trade its product in commercial quantities, i.e.,
that the quantities traded were "abnormally small," as compared
with the benchmark period, Commerce did not have a reasonable
basis to conclude that dumping would not ensue upon revocation.
Remand Results at 13.

Commerce has explained why its benchmark methodology
fulfills the purpose of the regulation and why it results in a
reasonable measure of "commercial quantities."  Accordingly, the
court sustains Commerce's determination not to revoke the
antidumping duty order with respect to SMC's sales of
hammers/sledges.


III. The Court Sustains Commerce's Remand Determination on
     Brokerage and Handling

In *Shandong I*, defendant-intervenor Ames True Temper
("Ames") challenged Commerce's finding that the surrogate value
for brokerage and handling included expenses for loading and
containerization.  In that opinion, the court observed that in
the Final Results Commerce declined to determine and separately

deduct these expenses from its net U.S. price[9] calculation

without investigating whether the expenses were in fact counted

in the surrogate value for brokerage and handling. *Shandong I*,

30 CIT at __, 435 F. Supp. 2d at 1288. Thus, the court

instructed Commerce to reexamine its conclusion on remand, and,

in the event Commerce again found that loading and

containerization expenses were included in the brokerage and

handling surrogate, to provide a thorough explanation for its

finding. *Id.* at __, 435 F. Supp. 2d at 1288.

With respect to loading expenses, Commerce continued to find

on remand that such expenses were included in the Indian

surrogate value for brokerage and handling derived from Certain

Stainless Steel Wire Rod from India, 64 Fed. Reg. 856 (Dep't of

Commerce Jan. 6, 1999) (final results) ("Steel Wire Rod from

India"). Remand Results at 18. To factually support this

finding, Commerce examined the questionnaire responses of Viraj

Impoexpo Limited ("Viraj"), a respondent in Steel Wire Rod from

India, and those of TMC and SMC.

---

[9]     Pursuant to the antidumping statute, Commerce shall
reduce the price used to establish export price (or U.S. price)
by "the amount, if any, included in such price, attributable to
any additional costs, charges, or expenses, and United States
import duties, which are incident to bringing the subject
merchandise from the original place of shipment in the exporting
country to the place of delivery in the United States . . . ."
19 U.S.C. § 1677a(c)(2)(A); *see Dupont Teijin Films USA, LP v.
United States*, 27 CIT 962, 963, 273 F. Supp. 2d 1347, 1349 (2003)
(noting that "export price" is "sometimes referred to as 'U.S.
price.'").

With respect to Viraj, Commerce noted that its delivery
terms were CIF (cost-insurance-freight), "which indicates that
Viraj was responsible for paying all costs incurred at the port
of export."  Remand Results at 18.  In addition, Commerce
observed that Viraj separately reported other costs, i.e., inland
foreign freight, international freight, and insurance, indicating
that where individual expenses were made, Viraj separately
accounted for them.  *Id.*  Since handling charges were not
included among the port of export costs that Viraj reported,
Commerce inferred that "any charges incurred in handling steel
wire rod coils at the port of export must be included in Viraj's
[brokerage and handling], as they were not reported by Viraj in
any other field."  *Id.*

Next, Commerce turned to TMC's and SMC's responses.
Commerce noted that, like Viraj, neither TMC nor SMC reported
brokerage and handling separately.  Rather, both indicated in
their responses that their brokerage and handling expenses were
included in freight invoices from the freight forwarder.  *Id.* at
18 (citing TMC's Oct. 10, 2003 Suppl. Quest. Resp. 2; SMC's Oct.
3, 2003 Suppl. Quest. Resp. 8).  Commerce observed that "TMC and
SMC did not report a separate charge for these [brokerage and
handling] expenses or claim that they were included in any other
reported expense category."  *Id.*  Commerce thus concluded:

> Since these costs were not elsewhere reported
> by Viraj, TMC, or SMC, it is reasonable for

> the Department, based upon record evidence,
> to consider the expenses associated with the
> movement of merchandise from truck to
> container yard and from container yard to
> ship, wharfage, stevedorage, berthage,
> terminal handling, and lashing to be included
> in [brokerage and handling] and covered by
> the surrogate value that the Department
> applied.

*Id*. at 18-19.

With respect to containerization expenses, Commerce drew
parallels among Viraj's, TMC's and SMC's responses as well.  The
Department noted that "TMC and SMC . . . reported that their
freight forwarder containerized their merchandise as consolidated
cargo," and that "[s]imilarly, Viraj noted that its steel wire
rod coils were 'stuffed in containers,' but did not report a
separate cost for this service or claim that it was included in
any other reported expense."  *Id*. at 19.  Commerce thus concluded
that "[s]ince these costs were not elsewhere reported by Viraj,
TMC and SMC, the Department reasonably concluded, based upon
record evidence, that the cost of containerization is included in
[brokerage and handling] and covered by the surrogate value that
the Department applied."  *Id*.  In sum, Commerce found that
loading and containerization charges were included in the
surrogate value for brokerage and handling:

> Viraj's experience is sufficiently similar to
> TMC and SMC that it serves as a reasonable
> surrogate value.  The port charges [i.e.,
> loading] and containerization expenses
> incurred by Viraj must be included in its
> reported [brokerage and handling] expense

Consol. Court No. 04-00460                                    Page 22

> because Viraj was required to report all such
> costs, and there is no reason to believe that
> it did not do so.

*Id.* at 19.  Accordingly, Commerce concluded that "[s]ince the

Department finds that Viraj's reported [brokerage and handling]

captures all relevant costs, the Department continues to find

that its decision in the <u>Final Results</u> to deduct only [brokerage

and handling] from U.S. price was correct."  *Id.*

Ames maintains that the Department's determination that

loading expenses were included in the surrogate value for

brokerage and handling "remains premised on speculation, and thus

unsupported by substantial evidence," despite the additional

explanation Commerce provided on remand.  Ames's Comments on

Commerce's Remand Results ("Ames's Comments") 11.  Specifically,

Ames argues that Commerce failed to analyze the issue of whether

wire rod and HFHTs were similar, such that the movement expenses

incurred for one would be similar to the expenses for the other.

Ames continues that "[e]ven to the extent that such merchandise

is similar, the Department still cites no particular evidence,

beyond mere speculation, that the goods incur the same expenses."

Ames's Comments 11.

With respect to containerization expenses, Ames makes a

similar argument: "It appears that the Department's only evidence

for [the conclusion that the cost of containerization is included

in brokerage and handling] is the absence of any statement

indicating where the containerization costs are reported."
Ames's Comments 12.  Ames insists that Commerce "thus, without
support, rules out the very real possibility that the
containerization operations were a part of Viraj's reported
internal cost of manufacture or packing fields, or were invoiced
and performed by a third party for whom the Department did not
request supporting documentation."  Ames's Comments 12.

        The court finds that on remand Commerce adequately explained
the basis for its finding that loading and containerization
expenses were included in the brokerage and handling surrogate.
As this Court has stated, "Commerce's general mandate . . . to
calculate normal value as accurately as possible on the basis of
the best available information . . . allows Commerce to draw
reasonable inferences from the record . . . ."  *Hebei Metals &
Minerals Imp. & Exp. Corp. v. United States*, 28 CIT 1185, 1203,
Slip Op. 04-88 at 28 (July 19, 2004) (not reported in the Federal
Supplement) (citation omitted).

        In *Shandong Huarong Machinery Co. v. United States*, 31 CIT
__, Slip Op. 07-3 (Jan. 9, 2007) (not reported in the Federal
Supplement), the Court was faced with a substantially similar
issue, and the parties raised similar arguments to those
presented here.  In that case, the results of Commerce's eleventh
administrative review of the antidumping orders on HFHTs were at
issue.  There, Commerce relied on record data in Steel Wire Rod

from India to value brokerage and handling, as it did here.
There, as here, Commerce found that Viraj's merchandise was
transported by truck, as was the PRC respondent's merchandise.
Commerce also found, as it did here, based on Viraj's CIF terms
of delivery, that "Viraj was responsible for paying all costs
incurred at the port of export." *Shandong Huarong Machinery Co.*,
31 CIT __, Slip Op. 07-3 at 22; Remand Results at 18.  In both
instances, Commerce found it was "reasonable to infer" based on
the record evidence that the respondents in Steel Wire Rod from
India and HFHTs from the PRC would have incurred the expenses
related to moving the merchandise from truck to shipping vessel
and loading it onto the vessel.  This is because, like Viraj,
"both TMC's and SMC's goods also have to be trucked to the port
and loaded and secured to a vessel."  Remand Results at 18;
*Shandong Huarong Machinery Co.*, 31 CIT __, Slip Op. 07-3 at 22.
Ames does not dispute the facts used by Commerce to reach its
conclusion.  Rather, its only claim is that they do not support
with substantial evidence Commerce's finding.

It is apparent that here Commerce has been reasonable in the
inferences it has drawn from the facts.  Thus, the court sustains
as reasonable and supported by substantial record evidence,
Commerce's inference that the surrogate value for brokerage and
handling includes the expenses incurred in loading and
containerizing the merchandise.

IV.  The Court Sustains Commerce's Valuation of Ocean Freight
     Expenses

     When calculating normal value in a nonmarket economy ("NME")

country, Commerce's regulations provide that Commerce

> normally will use publicly available
> information to value factors.  However, where
> a factor is purchased from a market economy
> supplier and paid for in a market economy
> currency, [Commerce] normally will use the
> price paid to the market economy supplier. In
> those instances where a portion of the factor
> is purchased from a market economy supplier
> and the remainder from a nonmarket economy
> supplier, [Commerce] normally will value the
> factor using the price paid to the market
> economy supplier.

19 C.F.R. § 351.408(c)(1).  Here, Commerce determined it would

use the actual, market economy prices that TMC and SMC paid to

their market economy suppliers to value ocean freight expenses,

if their market economy ocean freight purchases were

"meaningfully significant."  Remand Results at 19 (citing 19

C.F.R. § 351.408(c)(1) and *Shakeproof Assembly Components, Div.
of Ill. Tool Works v. United States*, 268 F.3d 1376 (Fed. Cir.
2001)).

     In *Shandong I*, the court found wanting Commerce's

explanation of its decision to aggregate TMC's and SMC's market

economy purchases as a single input, and remanded the matter:

> Although Commerce insists that its decision
> to aggregate is reasonable, and that the
> resultant aggregated amount rendered the
> total significant, it has not given a
> sufficient explanation of why that is so.
> Thus, the court remands this issue to afford

> Commerce an opportunity to provide a more
> complete explanation of its decision to
> aggregate.

*Shandong I*, 31 CIT at __, 435 F. Supp. 2d at 1291 (citation

omitted).

In the Remand Results, Commerce explained that "for the

purposes of determining whether or not the [market economy]

inputs are significant, the Department does not consider ocean

freight to different ports to be a different service or input."

Remand Results at 21.  Rather, Commerce found "shipping by a

particular method of conveyance to be a single input, albeit with

differing prices to different ports.  The input, conveyance of

goods by a particular method, is the same regardless of whether

the destination is near or far."  *Id*.  Commerce continued:

> If there were purchases from [market economy]
> and NME service providers within any single
> mode of transportation, the Department would
> conduct its significance test in aggregate
> for that particular mode of transportation,
> as was done in the <u>Final Results</u>.  However,
> within any single method of conveyance, the
> Department has never treated freight service
> to different locations as different inputs.
>
> While the distance of ocean freight is
> important, and may be a factor among several
> factors in how expensive the conveyance is,
> the service being purchased is still the
> same; namely, movement of goods.  Moreover,
> ocean freight carriers normally stop at
> various ports of call on their way to
> different destinations to ensure the vessel
> is full of cargo.  We do not believe it would
> be reasonable to consider freight service to
> different ports of call to be different
> inputs.  For example, in instances where a

> single ocean vessel has several ports of call
> on its itinerary for a given voyage, it is
> not clear to the Department how each stop can
> be considered a different "input" or service
> apart from the rest of the voyage.  Thus, the
> Department's practice is to determine whether
> or not this service – ocean freight – is
> purchased in significant amounts from a
> [market economy] supplier on an aggregate
> basis.

*Id.* at 21-22.  Thus, when applying its "meaningfully significant"
test, Commerce continued to treat aggregated market economy ocean
freight shipments as a single input rather than considering each
shipment to a different port as a separate input.

Ames argues that Commerce failed to support with evidence
its treatment of ocean freight as a single input.  Specifically,
Ames takes issue with Commerce's assertion that "ocean freight
carriers normally stop at various ports of call on their way to
different destinations to ensure the vessel is full of cargo," as
a reason it cannot calculate port-to-port charges: "What is
missing . . . is any evidence that the vessels involved in
transporting the respondents' merchandise made stops at multiple
ports of call."  Ames's Comments 12-13.  Thus, Ames objects to
Commerce's decision to aggregate ocean freight expenses.

The court sustains Commerce's valuation of ocean freight
expenses.  Pursuant to 19 U.S.C. § 1677b(c)(1) and the
accompanying regulation, Commerce is to value the factors of
production "based on the best available information regarding the
values of such factors in a market economy country . . . ."  19

U.S.C. § 1677b(c)(1); *see also* 19 C.F.R. § 351.408(c)(1).  "While Congress has left it within Commerce's discretion to develop methodologies to enforce the antidumping statute, any given methodology must always seek to effectuate the statutory purpose—calculating accurate dumping margins." *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 23 CIT 479, 483, 59 F. Supp. 2d 1354, 1358 (1999), *aff'd*, 268 F.3d 1376 (Fed. Cir. 2001); *see also Allied-Signal Aerospace Co. v. United States*, 996 F.2d 1185, 1191 (Fed. Cir. 1993) (stating that the purpose behind the antidumping statute "is to facilitate the determination of dumping margins as accurately as possible within the confines of extremely short statutory deadlines").

Ames faults Commerce's reasoning, alleging a failure by Commerce to support with record evidence its assertion that the ships carrying respondents' freight stopped at multiple ports of call.  Ames's Comments 13.  Ames's argument, however, overlooks an important point.  The main consideration in Commerce's decision to treat TMC's and SMC's market economy purchases of ocean freight as a single input is that ocean freight is a single service, i.e., the movement of goods.  In addition, the movement of goods is made by a single mode of transportation.  That being the case, the number of stops a vessel makes en route to its final destination does not require the valuation of multiple

inputs.  That is, while the distance between each port may vary, the "service" purchased is indivisible.

As Commerce explained, distance is "important, and may be a factor among several factors in how expensive the conveyance is," and the record supports this statement.  Remand Results at 22; *see, e.g.*, SMC's Sec. C Questionnaire Resp. at C-2 (indicating the price for the service of moving goods paid to a market economy supplier is "based on weight and destination").  That is, the distance traveled and the ports visited may be important for some purposes, but when the mode of transportation remains the same, that mode constitutes a single input.  Looked at in this way it can hardly be said that treating ocean freight as a single input is unreasonable.  *Shieldalloy Metallurgical Corp. v. United States*, 20 CIT 1362, 1368, 947 F. Supp. 525, 532 (1996) ("[A]s long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology.") (internal citation & quotation marks omitted).  Thus, the court finds Commerce's decision to aggregate ocean freight shipments as a single input and upon doing so to find that the purchase of these services was meaningfully significant to be reasonable and supported by substantial

evidence on the record.


V.   The Court Sustains Commerce's Decision Not to Make A
     Circumstances-of-Sale Adjustment to TMC's Normal Value

     In the market economy context, Commerce is authorized to

make a circumstances-of-sale adjustment to normal value to

account for differences in expenses, including differences in

"direct selling expenses," incurred in the U.S. and foreign

markets.  *See* 19 U.S.C. § 1677b(a)(6)(C)(iii); *see also* 19 C.F.R.

§§ 351.410(a) & (b).  Under Commerce's regulations, "direct

selling expenses" include "commissions . . . that result from,

and bear a direct relationship to, the particular sale in

question."  19 C.F.R. § 351.410(c).  Normally, "the Department

makes a [circumstances-of-sale] adjustment by deducting

comparison market[10] commissions [from normal value] and adding

U.S. commissions.  But it also offsets commissions with indirect

selling expenses."[11]  Remand Results at 25.  In addition,

_____

     [10]    Here, the "comparison market" means the foreign home
market.

     [11]    Indirect selling expenses are "selling expenses, other
than direct selling expenses . . . (*see* [19 C.F.R.] § 351.410),
that the seller would incur regardless of whether particular
sales were made, but that reasonably may be attributed, in whole
or in part, to such sales."  19 C.F.R. § 351.412(f)(2) (defining
"indirect selling expenses" in the context of constructed export
price offset).  This Court has described indirect selling
expenses as "those 'sales-related' expenses that do not vary with
the quantity sold or are not related to a particular sale.  They
are, quite simply, a part of the cost of doing business."  *Agro*
                                                    (continued...)

Commerce "will make a circumstances of sale adjustment to [normal value] where commissions are paid in one market and not the other."  *Id*. at 25 (citing 19 C.F.R. § 351.410(e)).[12]  "The statutory purpose of the circumstance-of-sales adjustments is to allow for a fair 'apple-to-apple' comparison of sales in the [foreign home market and the U.S. market] at the specific common point in the chain of commerce when the merchandise is leaving the factory gates."  *AOC Int'l, Inc. v. United States*, 13 CIT 716, 718, 721 F. Supp. 314, 317 (1989), *rev'd on other grounds sub nom. Zenith Elecs. Corp. v. United States*, 77 F.3d 426 (Fed. Cir. 1996) (internal quotation marks omitted; citing *Smith-Corona Group, SCM Corp. v. United States*, 713 F. 2d 1568, 1572 (Fed. Cir. 1983)); *see also Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1568 (Fed. Cir. 1994) ("To ensure that the quantum of antidumping duties is calculated in a fair manner, both foreign market value and United States price are subject to certain adjustments in order to achieve a common point at which to perform the price comparison.").

_____

[11](...continued)
*Dutch Indus., Ltd. v. United States*, 30 CIT __, __, Slip Op. 06-40 at 7 (Mar. 28, 2006) (not reported in the Federal Supplement) (citation omitted).

[12]     Title 19 C.F.R. § 351.410(e) provides that Commerce "normally will make a reasonable allowance for other [i.e., indirect] selling expenses if [Commerce] makes a reasonable allowance for commissions in one of the markets under consideration, and no commission is paid in the other market under consideration."

According to Commerce, in the NME context, it generally does not make a circumstances-of-sale adjustment to normal value for commissions. *Shandong I*, 30 CIT at __, 435 F. Supp. 2d at 1293 ("Commerce maintains an established practice of not making circumstances-of-sale adjustments in NME cases."). In *Shandong I*, Ames challenged Commerce's decision in the Final Results not to make a circumstances-of-sale adjustment to normal value to account for commissions that TMC paid to its affiliated U.S. sales office. *See* 19 U.S.C. § 1677b(a)(6)(C)(iii). Ames argued that the record contained sufficient evidence to make the adjustment in the same way it would be made in a market economy situation. *Shandong I*, 30 CIT at __, 435 F. Supp. 2d at 1292.

The court remanded this issue, finding that Commerce's reliance solely on its past practice was insufficient:

> [I]t is apparent that Commerce's past practice to refrain from making circumstances-of-sale adjustments in NME situations is based on its conclusion that, in most such cases, there is not enough information on the record to make a determination based on substantial evidence. While this may be true in most cases, the court observes that Commerce does not cite any evidentiary basis for its determination in this case, other than its past practice. For that reason, the court remands this issue to Commerce to allow the agency to further explain its determination that the record here was devoid of substantial evidence to permit a circumstances-of-sale adjustment.

*Shandong I*, 30 CIT at __, 435 F. Supp. 2d at 1293.

On remand, Commerce "continues to find that the record does

not contain the level of detail necessary to make appropriate

adjustments to [normal value] to account for commissions."

Remand Results at 25.  In doing so, Commerce first states that

"Ames has oversimplified the Department's methodology with

respect to the treatment of selling commissions" by failing to

acknowledge that where commissions are paid in either the U.S.

market or the comparison market but not both, Commerce offsets

the commissions paid with indirect selling expenses in accordance

with 19 C.F.R. § 351.410(e).  *Id.*  In the Remand Results,

Commerce sets out the methodology it uses in market economy

investigations:

> Where commissions are paid in the comparison
> market [the foreign home market] but not in
> the U.S. market, the Department offsets the
> comparison market commissions, which are
> deducted from [normal value], by adding to
> [normal value] an amount for U.S. indirect
> selling expenses.  This offset is the lesser
> of (1) the amount of the commission paid in
> the comparison market, or (2) the amount of
> indirect selling expenses incurred for U.S.
> market sales.

*Id.* at 26 n.10.  Commerce continues:

> Where commissions are paid in the U.S. market
> but not in the comparison market, the
> Department offsets the U.S. commission, which
> is added to [normal value], by deducting from
> [normal value] an amount of indirect selling
> expenses for comparison market sales.  The
> offset is the lesser of (1) the amount of the
> commission paid in the U.S. market, or (2)
> the amount of indirect selling expenses
> incurred on comparison market sales.

*Id.* at 26 n.11.  Ames does not dispute this methodology.

Applying its methodology to the facts of this case, Commerce

observes that TMC had not paid selling commissions on some of its

U.S. sales:

> In the instant case, TMC reported that
> certain of its U.S. sales had no commissions.
> For those U.S. sales that did not have a
> commission, the Department would need to know
> the amount of indirect selling expenses
> incurred with respect to those sales in order
> to determine the commission offset to be
> applied to the [normal value] for those
> sales.  We do not request PRC respondents to
> report U.S. indirect selling expenses for
> [export price] sales, as those expenses are
> internal PRC expenses and thus considered
> unreliable.  Therefore, we would not have
> appropriate information to use to offset any
> surrogate commissions deducted from [normal
> value].

*Id*. (footnote omitted).  In other words, with respect to TMC's

U.S. sales that had no U.S. commissions, using its market economy

methodology, Commerce would have to determine the amount of

indirect expenses that TMC incurred in the PRC with respect to

those U.S. sales.  However, as Commerce observes, determining the

indirect expenses that TMC incurred in the PRC with respect to

U.S. sales is impossible because that information is internal,

PRC-company information and is therefore considered unreliable.[13]

_____

[13]    Because PRC-company information is unreliable, Commerce
considers commissions to be a standard selling cost that is
included in selling, general and administrative expenses
("SG&A").  *See, e.g.*, Tapered Roller Bearings and Parts Thereof,
Finished and Unfinished, From the PRC, 63 Fed. Reg. 63,842,
63,852-53 (Dep't of Commerce Nov. 17, 1998) (final results)
("[Commissions are] standard selling costs and, as such, are
                                              (continued...)

Because this sales information is considered unreliable, Commerce

does not request it.

Commerce continues its analysis with respect to TMC's U.S.

sales that had commissions:

> For those [of TMC's] U.S. sales that had
> commissions associated with them, we would
> also need to be able to accurately quantify
> the indirect selling expenses in the
> surrogate [selling, general and
> administrative expenses ("SG&A")] data so as
> to properly offset the U.S. commission, to
> the extent that the U.S. commission is
> greater than the surrogate commission.  In
> this instance, the survey data from the 2,024
> Indian companies used for SG&A indicates that
> some part of the sales by those companies did
> have commissions.  *However, the Department
> cannot reasonably assume that all of the
> sales by those Indian companies had
> commissions.  Instead, we find it reasonable
> to assume that some portion of the Indian
> sales did not have commissions.  Therefore,
> to the extent that the surrogate SG&A
> reflects sales that have no commissions
> associated with them, we would need to take
> into account indirect expenses as an offset
> to the U.S. commission.*  In other words,
> assuming the U.S. commission is greater than
> the surrogate commission, we would not simply
> deduct the surrogate commission [from normal
> value] and add the U.S. commission [to normal
> value]; we would further offset any remaining
> difference with indirect selling expenses of
> the surrogate, in accordance with our normal
> practice.  Therefore, in attempting to
> calculate the commission offset, the
> Department would need to identify the amount
> of indirect selling expenses incurred by the
> 2,024 companies on Indian market sales.
> Although there are a few line items of

---

[13](...continued)
properly categorized under SG&A.").

> expenses in the survey data that may include
> some or all of the indirect selling expenses
> of the surveyed companies (such as
> "Advertisement" or "Insurance"), the
> Department has no way of separating the
> indirect selling expenses from direct selling
> expenses, nor indirect selling expenses from
> general or administrative expenses.  For this
> reason, the Department cannot calculate the
> indirect selling expenses incurred on sales
> reflected in the Indian surrogate data, and
> therefore the Department cannot be certain
> that the commission offset would be accurate.

*Id.* (footnote omitted; emphasis added).  Put another way, when

TMC incurred U.S. commissions (a direct selling expense) but no

commissions were paid in its home market, Commerce would, in a

market economy context, adjust normal value downward to the

extent of domestic indirect selling expenses.[14]  Here, to

determine if it could produce a number representing these

indirect selling expenses, Commerce turned to the Indian

surrogate data used for selling, general and administrative

expenses ("SG&A") and found that it could not separate the

indirect selling expenses from the general or administrative

expenses of the 2,024 Indian companies whose data comprise the

surrogate SG&A data.  Thus, Commerce found the available data

insufficient to make an accurate circumstances-of-sale adjustment

to normal value where U.S. sales commissions were present.

---

[14]     The justification for the adjustment is that it may be
reasonable to assume that some of the functions accounted for in
the indirect selling expenses in the foreign home market were
those paid for by the commissions paid in the U.S. market.

Next, Commerce noted that because it normally does not make circumstances-of-sale adjustments in NME proceedings, it "did not examine whether TMC's commissions were made at arm's-length, nor did it request the affiliated agent's actual expenses, during the underlying review."  Remand Results at 27.  Commerce determined that "[w]ithout this information, the Department cannot determine the proper amount of any adjustment for the commission."  *Id*.

The court sustains Commerce's finding, on remand, that the record does not support a circumstances-of-sale adjustment in this case because Commerce has adequately explained its decision not to make such an adjustment and supported that decision with substantial evidence from the record.  "The party seeking a direct . . . adjustment bears the burden of proving entitlement to such an adjustment."  *SKF USA Inc. v. INA Walzlager Schaeffler KG*, 180 F.3d 1370, 1377 (Fed. Cir. 1999) (citing *Fujitzu Gen. Ltd. v. United States*, 88 F.3d 1034, 1040 (Fed. Cir. 1996)).  Ames's arguments to the contrary notwithstanding, it is evident that sufficient evidence was not placed on the record to make the adjustment.  That being the case, the court finds reasonable Commerce's decision not to make a circumstances-of-sale adjustment to TMC's normal value in this case.

VI.  The Court Sustains Commerce's Remand Determinations With
     Respect To Which There is No Dispute

With respect to the issues of (1) Commerce's application of

AFA to sales of merchandise covered by the axes/adzes and
bars/wedges orders, and (2) Commerce's valuation of pallets, no
party objects to the Remand Results, and the court finds them to
be supported by substantial evidence and otherwise in accordance
with law.


### CONCLUSION

     In accordance with the foregoing, the court sustains
Commerce's Remand Results.  Judgment shall be entered
accordingly.


                                    /s/Richard K. Eaton
                                      Richard K. Eaton


Dated:     November 20, 2007
           New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

```
                                   :
SHANDONG HUARONG MACHINERY CO.,    :
LTD., SHANDONG MACHINERY IMPORT    :
& EXPORT CORPORATION, LIAONING     :
MACHINERY IMPORT & EXPORT          :
CORPORATION, AND TIANJIN           :
MACHINERY IMPORT & EXPORT          :
CORPORATION,                       :
                                   :
            Plaintiffs,            :
                                   : Before: Richard K. Eaton, Judge
         v.                        :
                                   : Consol. Court No. 04-00460
UNITED STATES,                     :
                                   : Public Version
            Defendant,             :
                                   :
      and                          :
                                   :
AMES TRUE TEMPER,                  :
                                   :
            Deft.-Int.             :
                                   :
```

JUDGMENT

This case having been submitted for decision and the court, after deliberation, having rendered a decision therein; now, in conformity with that decision, it is hereby

ORDERED that the United States Department of Commerce's Final Results of Redetermination, issued pursuant to the court's opinion and order in *Shandong Huarong Machinery Co. v. United States*, 30 CIT __, 435 F. Supp. 2d 1261 (2006), are sustained; and it is further

ORDERED that this case is dismissed.


                                        /s/Richard K. Eaton
                                        Richard K. Eaton

Dated:      November 20, 2007
            New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____

Deputy Clerk